Yes, sir. May it please the Court, Michael Herman for Mr. Mendez, Your Honor. This case is about the custodial statement and whether the district court erred in refusing to suppress that statement as the fruit of an unconstitutional stop, search, and seizure. The statement at issue was the result of two converging sets of events. One was a traffic stop. The police stopped Mr. Mendez as he drove away from his residence. They searched his car. They found incriminating evidence, a gun and synthetic marijuana. They seized him and they transported him back to his house, where they then carried out the second set of events, which was the implementation of a previously authorized search warrant to search his home. And there they found, later, after Mr. Mendez had already been stopped and detained at the first traffic stop, later they found bullets in the home, and then the two sets of events converged when DPS officers took him back to the DPS headquarters and interrogated him about both sets of events. The district court's error in this case was in premising its decision on one sole factor, and that factor was the advent of intervening probable cause arising from the discovery of the bullets after the unconstitutional stop, search, and seizure had already occurred. We know that reliance on one sole factor is error from the Supreme Court precedent and from this court's precedent. In Brown v. Illinois, the Supreme Court rejected reliance on a sole factor there. It would have been voluntariness as established through Miranda. And instead, in Brown, the Supreme Court adopted the multi-factor test that we now have, looking at temporal proximity, flagrancy of the unconstitutional conduct, and intervening circumstances. Let me ask something. They had a warrant to search the house. Yes, Your Honor. Nobody's arguing that the warrant was improper. No, Your Honor. That was conceded at the district court level. Oh, they're going to get into the house, and they're going to find the bullets. None of the rest of this stuff had ever even happened. They're going to get into the house and find the bullets, and that's that. Yes, and that's why we didn't challenge the bullets in the district court. That was part of the evidence that was going to come in. The issue, though, was that the custodial statement, because that was the result not just of those bullets, but it was the unconstitutional seizure that had first occurred, the discovery of this other incriminating evidence that had first occurred, and then the district court found that that first unconstitutional stop was in violation of the Constitution under Bailey and suppressed all that evidence. And it was both sets of events together that came into, then, the custodial statement and was the subject of what was discussed at the custodial statement. And as we pointed out in the opening brief, the government then used that custodial statement to prove up knowledge, not just of the gun found in the house, but knowledge of the bullets as well. They had to have something to show that the bedroom in which it was found was his. This was a location with multiple people living in it. And so the statement was key to prove up the knowledge of guilt both for the bullets and for the firearm itself. When they obtained this confession, I think I need to listen. I know there's an audio recording, I think, that was introduced at trial that I probably need to get and listen to. But because based on the testimony, there's not a lot of testimony about everything that happened in that conversation with your client and law enforcement. But as best from your review of the record, did they use the fact that this gun was found in his common-law wife's purse to help get the confession? Because the case law talks in this situation a lot about did the officers exploit the unlawful seizure, which was the car stop, in getting this other evidence for which there was also intervening cause. So we're in this sequence of this because what I've seen in the confession is they sort of say, well, we searched your house. Tell us what we found. And he says, well, you found ammo and you found a gun in this box that they then go back and find. So where did they use the part about potentially pinning this on his wife? What we have in the record is the interview that was introduced as evidence at trial. And that was four minutes out of what the agent testified at trial was an hour-and-a-half long interview. So it was redacted down substantially to just four minutes. I believe that I have supplemented the record with a transcript of that interview so the court can look at it. And in the briefs I set out the timeline that you're correct, Your Honor, that the four minutes that we have shows a discussion first about what was in the house and some admissions to other things. But at the end of that statement, in the format, however, it was redacted, what we have is the officers asking Mendez to claim responsibility for that gun so that it would not be blamed on his girlfriend. So they used the gun that was found in the car, the revolver that the district court had submitted. Were there any statements before he tells them you found ammo and a gun in my house? I think it's very unclear. In the actual timing. You see why I'm asking, I think, that. I do. Yeah. But in the timing of what was actually played in the district court, it comes at minute four. But we have four minutes out of what the agent testified was a 90-plus minute statement. And so that really is the key error that we have focused on in this case. The district court's error was looking just to one factor. We're not arguing that this court should find that the statement should be suppressed. We're not arguing that the record is developed enough to make that merits determination. On the contrary, what we're arguing is that the record itself wasn't developed enough and that the district court's error was looking only to that issue of intervening probable cause. That's clear from what the district court actually ordered. When you say the record isn't developed enough, I know you're saying the judge didn't consider all three factors. Are you saying there needs to be more testimony? There does. You had a full suppression hearing, and why do you get a chance at a new hearing? It's not actually our chance, Your Honor, because both Brown and then this court's decision in Cherry on which we rely for the key proposition that the district court's reliance on the sole factor of intervening probable cause was an error, both of those cases established that it's the government's burden to prove that the taint has been attenuated. And just like in Cherry, the government didn't offer evidence on the attenuation of this taint other than intervening probable cause. So it was the government's burden to do this. The government did not do it. And in Cherry and then in the subsequent case from 2014 of Guzman, where you had a similar motion to suppress where the district court made an error in looking to one sole factor without full development of the other factors it was supposed to rely on, this court in both of those cases, separated by 30 years, said the government bore the burden and it remanded to the district court for further determination of the record because the record was insufficient. This court refused in Guzman to look for all reasonable views of the evidence because the court found there simply wasn't evidence in the record to make that determination. And that's what we have here, a failure in the district court of the district court to look at all the Brown factors and a failure of the government to meet its burden to prove up evidence and to make arguments on all of the factors other than intervening probable cause, which constitutes the record. There's two others. One is the timing. Yes. The other, which the courts have said is the most important, is the flagrancy of the violation. So tell me why you think the flagrancy favors you. I mean, the Supreme Court in the Utah case says just the fact that there was an unconstitutional stop doesn't get you flagrancy because you're not going to be in this world if there wasn't something unconstitutional the police did. So what about this beyond just that they violated the law in stopping him? What makes it flagrant? If I may, before I answer that, I just want to make sure that I'm clear that I'm not accepting a burden that's not the defendant's to go forward with. The government had the burden in the district court, and the government didn't meet it. And so what I'm pointing out— The government has the burden to show it's not flagrant. Right, to show that the taint's been attenuated. Well, their argument is the purpose was just for safety. They could have stopped him at the driveway or up at the house, actually, and talked to him. So it's not a case where they had no basis to talk to him. The only reason they waited until he drove off for a few minutes was the safety since they had, because of the warrant, the right to talk to him at the house. So how do you respond to that, and what factors can you show that would make it seem more flagrant than that portrayal that their brief offers? Certainly. The flagrancy, first of all. And these are things that we piece together from what the agent said, because the government never directly introduced evidence on these factors. The government never directly argued these factors, and the district court didn't address them. So I'm drawing from what are pieces that the agents have said, not in response to questions to get to these factors, but just what we can glean from the incomplete record that's there. So on flagrancy, the agent testified at the suppression hearing that he and the other agents purposefully planned how to execute this warrant. Why do I say that? The agent testified that they met the evening before the execution of the warrant with all the officers who were going to be involved, that they talked about making sure that Mendez was away from the house before they stopped him and then before they started carrying out the search warrant. The agent testified that he consulted with his superiors before implementing this plan. So this was a planned and purposeful in that sense action. I'm not claiming that it was deliberate in the sense of the officer deliberately violated Bailey. That's not what I'm claiming. But in Haring, the Supreme Court set the bar far less for application of the exclusionary rule. Haring involved an officer's mistake, and not just the officer's mistake, but a police department's mistake about whether a warrant was actually authorized or not. And the Supreme Court there said mere negligence is not sufficient. But the Supreme Court did say that in order to merit the exclusionary rule and to have conduct that should be deterred and that is culpable, you need at least grossly negligent or reckless actions. And that's what the testimony of the agent shows here. This agent testified that he is in charge of investigating gangs and drugs in the Corpus Christi area. He testified that he had experience with the execution of search warrants. He was the leader of the execution of this search warrant, and he brought in a SWAT team. First he wanted to bring in DPS's SWAT team. Then he brought in Corpus Christi's. So he brought in a unit specialized in the execution of warrants. So the level of experience and the positions of these officers show that they should have been aware of Bailey because it was their business. It's their specialization. And Bailey had been the law already for two years. Bailey had been the law telling these officers not to do exactly what they planned to do. So it's flagrant in the sense that it rises to the level of herring culpability, and it's flagrant in the sense that it was purposeful in its actions. That is combined then with what we can also glean from the record about temporal proximity. We know from what the officer said that they started at about 830 in the morning, that they had Mr. Mendez detained within a minute of that initiation, and then around two or three hours later they finished with the search and were getting his statement. So we have a period of six hours or less, which is less than what the Supreme Court in Taylor v. Alabama found to be sufficient to be a significant attenuation in terms of the time period. So we have issues related to flagrancy and temporal proximity, both that I'm just drawing from the hints that are available in the record that nobody actually addressed in the district court when the government had the burden to do so. And then finally we've discussed actual exploitation already. That's from the four minutes we have from that hour and a half statement. And so if even in the four minutes chosen to play at trial we have an indication that the officers are asking this defendant to accept responsibility for the gun in the car, and of course they would because they didn't know at the time they were asking these questions that they were going to have that stop suppressed. So of course they asked about it and utilized it. So what else is there in the record? And that really is the key point. It was the failure of the district court to engage in the full analysis of the Brown v. Illinois factors. The key case, I think, to sort of structure this view is United States v. Martinez, which we addressed in our reply brief in response to the government's argument that this should be on plain error. In Martinez this court was faced with a very similar circumstance in that in the district court the defendant argued that the stop was illegal because the officers didn't have reasonable suspicion. That was it, full stop, just that argument. And on appeal the defendant argued that there wasn't reasonable suspicion because the confidential informant's tip wasn't reliable. The government argued plain error and the court said no. And the court actually used the phrase the crucial fact. The crucial fact in that case was that it was the government's burden to prove up reasonable suspicion. And so although the court was very critical of the performance of the attorney in the district court, and that attorney was me, although the court was very critical of that performance, the court still said the attorney presented the argument, laid out what the complaint was so the government couldn't complain that it didn't know what the complaint was about, and then the government did what it should have done in terms of trying to address it, but it failed. And that's what we have here. In this case, Mr. Mendez's attorney laid out twice in writing, pre the motions hearing and post the motions hearing, referring to Brown as the appropriate framework, referring to all of the factors in Brown, and in the post-motion briefing stating that the government had failed to meet its burden. So the defendant put everyone on notice about what should be determined, and although the defense counsel could be faulted for not having made these arguments completely, at this stage it was the government's burden to carry forward, and the district court was aware of what it had to determine, and the district court simply made an error. That error was a clear error of law under this court's 1985 decision in Cherry. It was a clear error of law under Taylor v. Alabama, where the Supreme Court rejected reliance on intervening probable cause when the other factors weigh heavily against finding that intervening probable cause is sufficient. And even in Utah v. Strieff, where the existence of a preexisting arrest warrant was the critical or key factor in the court's decision, the justices there still looked to temporal proximity, and as you pointed out, Your Honor, the flagrancy of the action, finding that officer's action wasn't flagrant because he just made a mistake. Didn't the officer who was executing the warrant, they already have probable cause to believe drug dealing is going on inside the house or the judge wanted to issue the warrant, and then he sees some people at the house conducting what might look like drug transactions. So the government had argued there was reasonable suspicion. Judge Rainey said, well, but you didn't tell that to the officer you radioed ahead to. I mean, I think there's a collective knowledge doctrine, but the government's not appealing that. But in looking at the flagrancy and these other things, can't we consider the fact that that officer had reason to believe that he'd just been dealing drugs outside his house that very morning? He could have very well had reason to believe, as you said, that he had been dealing in something. One of the key problems in this case is we don't really know what he was dealing. Throughout, it's referred to as synthetic marijuana. There was never any evidence presented that there had been any testing done of this synthetic substance. We don't know if this was a substance that was illegal, and in that four minutes that the government played at trial, one of the words that Mendez uses is legal. And what he was referring to was the substance that he was found with, indicating that this is like one of those substances that the government hasn't yet scheduled. It's one of those synthetic substances that's still technically legal, although it's a substance that evades the impact of the law. So we don't really know because there was never any proof that they actually had reasonable suspicion of anything. And they had been doing this investigation for a while, but yet we have no evidence that there was any actual testing done or anything to support such a reasonable suspicion. But even if there were reasonable suspicion for that, that alone would not have given them the authority then to just merely stop him and do what they had done in violation of Bailey itself, particularly because all he saw was what he thought were those types of transactions. It wasn't the undercover transaction where they had sent someone in, if I remember the record correctly. Thank you. Thank you, Your Honor. Thank you, sir. Ms. Wilson. May it please the Court. Eileen Wilson on behalf of the government. The district court correctly applied the law to the largely undisputed facts in this case. The court didn't employ a per se approach, but instead made a well-reasoned decision that there had been sufficient attenuation. And in doing so, the court's order cites both Brown and the relevant three factors. Under existing law, the court wasn't required to parse out each factor. And that's particularly true here where you have an extremely conscientious district court judge who is knowledgeable about both the facts and the law. Judge Rainey had the benefit of three live witnesses' testimonies. And I believe that there were four different pleadings filed. After the suppression hearing, there was also a lengthy discussion in which Judge Rainey hypothesized various scenarios and what would be the legalities of it all. He considered it somewhat of a hybrid situation. But he didn't want to rule from the bench. Instead, he wanted to think about the issues even further. And he did that. And approximately a month later, we have the seven-page order in which he discusses that it was a stop incident to the search warrant, but it was unreasonable. Excuse me. And that decision largely was made on Bailey. And what we know from Bailey is that you have to have the proximity requirement in the immediate vicinity. Judge Rainey recognized that there was an officer safety issue involved, and there's no dispute about that, that the officers were acting reasonably in the sense that they had done some type of safety matrix in which they determined that this scenario or this situation was so unsafe that they had consulted a SWAT team out of Austin to help them. For whatever reason, the Austin team was not able to help them. So they enlisted the help of the Corpus Christi DPS SWAT team, and they were lined up to do the execution of the search warrant. But the day before it happened, three of those officers were shot. So these officers were left on their own. They were nervous about the situation, and that's the stage for how all of this occurred. The record is clear that they were pretty much afraid of this gentleman. His home was shot up with bullet holes already. He was a suspect in a drive-by shooting, so they didn't want to go in. They surveilled the premises in which they saw during the same day, I believe it's February 20th, some hand-to-hand transactions, which they believed to be drugs, and they waited for him to actually leave the premises. At some point, Mendez does come out with his girlfriend, and the DPS agent, Russell, immediately radios to his supervisor, who in turn alerts Corpus Christi. And that's Officer Thurman who ultimately pulls him over. And obviously, Judge, I keep doing that. I'm so sorry. Officer Thurman is not acting in bad faith or flagrantly or anything like that. He honestly testifies, I pulled him over because I was told to do that. He doesn't make up a reason. Nobody had conveyed to him about the hand-to-hand combat. That's all we know is that he was doing his job. His superior had told him to pull Mendez over, and that's what he did. The record is undisputed that the conduct from there forward, regardless of whether the stop is bad, but that Officer Thurman acted lawfully. He segregated Mendez and his girlfriend. He frisked him for safety, put him in a vehicle, and then did a sweep of the sedan or car, whatever it was, seized a gun, wrapped in a bandana, of course, but it feels like a gun. All of that is above board. He calls, he takes them back to the search, where the house is being searched after the premises are secured. Now, that's the part that Judge Rainey finds is the bad stop leading up to all of that because of the Bailey issue, the proximity issue, that he was a half a mile away, and I believe it was less than a minute he testified to, but Bailey is very clear, if you're not in the immediate vicinity, that's not enough. Cases have held two or three blocks aren't even in the immediate vicinity. So at this point, they've executed the search warrant, and they find ammunition. There's no dispute. In fact, there was a stipulation at trial that Mr. Mendez is a convicted felon. So when they find the ammunition, no dispute, they've got probable cause to arrest him. Judge Rainey's order says that they arrest him when he's taken to the DPS station. However, there is testimony that he was arrested actually on the premises where the house is. But be that as it may, he's transported down to the DPS station, and now there is a 99-page transcription of that interview. However, that, of course, wasn't the case during the suppression hearing. But in that interview, the DPS officer and the ATF officer both talked to him, and he agrees, Mendez agrees, to waive his Miranda rights. And don't forget, he's a convicted felon with a pretty long history, so he's very familiar with the judicial system. While I was sitting there, I was trying to look up your question, Judge Costa, and I think around page 9 is where some of that starts. And what Agent Hernandez is saying is, so tell me, where did we find this? Did we find that? Where did we find the firearms? And he says, plural, and Mendez says something about how he had bought it for two bills off of the street because he was a convicted felon. But then Hernandez talks about the Glock, and the Glock is what they knew about pre-search warrant, and that's what they were looking for, but they did not find it during the execution of the search warrant. Going back to the question I asked the other side, do you know where in the course of that interview they brought up the fact that you don't want your wife who had this gun in her purse to be responsible, so you better own up to all this? Because that seems to me to be the potential use of the illegal stop. As you said, they had a right to arrest him based on the ammo found during the search warrant, so if that was just what directly led to the confession, it's not as problematic as if they used this guilt trip about the wife's potential exposure to get the confession. I will defer to you on the transcript. As I said, I was looking at it. I don't see that in the very few beginning pages. It's what about the firearms? What about the Glock? Because they couldn't find the Glock. They found an empty box, but they wanted— They had the gun that was in the bandana. Correct. And so he fesses up about where the Glock is after a little bit of exchange. Now, one thing that's not in dispute is that subsequently the officers returned to the house after they secure the information of where the Glock can be found, and Mendez's father gives consent to search the premises. And they now know exactly where it is, and they go and they get the Glock out of the box. But the other side is not contesting that either. Instead, what I understand this case to be is very narrow, and that is they're dissatisfied, if you will, with Judge Rainey's order. As I said in the beginning of my brief, clearly we're under de novo review, clearly we're under clear error, and all of the deferential and often favorable standards that we're under. But what we have here is Judge Rainey set forth all of the facts that occurred. He specifically cites Brown. He specifically cites the three factors. What he doesn't do is he doesn't say factor one, temporal proximity, X. Factor two, Y. The law is filled, as you know, with these multi-part tests, and you don't always have to go through every one. Sometimes one is important enough to carry the day. But I guess what troubles me is the third factor on flagrancy has been, the Supreme Court just last year called it particularly significant. Correct. So, you know, if he just found two of them in favor of the government, so I'm not going to get into the temporal proximity, probably not an issue. But he doesn't get into what the Court has said is usually the most important factor. He either said it was flagrant or not. I don't necessarily agree with that, and with all due respect. But first, I want to do get out, that's why I said the plain error. I realize that it's our burden, no question about that. My point simply was if you want these extraordinarily, even more detailed orders than Judge Rainey, who does, is far more detailed than most, then, you know, we need to have the Court alert us to that. But be that as it may. You mean the defense? So you're saying it's plain error because after Judge Rainey issues his order, they should have filed something, I guess reconsideration, saying, you know, we don't like your order, you need to address. I mean, you know what your district, I don't know the rule that says plain error applies because you didn't file reconsideration. It's actually alerting to the Court that you're very unhappy with this order, because that's why we're here. I believe that the record is. But they did say there's these three brown factors. Exactly. We believe that the order is sufficient and also that the evidence is sufficient. There's no, there is, the evidence is undisputed that Officer Thurman, who was the officer that did the stop at, I think at the street was Duncan, not that it matters, but that he was waiting for his orders, got them, pulled them over. In the Utah case or the street case, whatever we want to call it, the Court was very clear that that is the most important thing. But what the Court also talked about there, and we don't have this here, again, there's no evidence of any kind of recurrent conduct on the part of these officers. It was a straight-up investigation. At most, just like the Utah case, we have an isolated instance of maybe negligence. I'm not certain what it would be, because we have an officer who in good faith testified, I did what I was told. And as you pointed out, Judge Costa, there is a collective knowledge issue here, but that was never developed below. So, of course, I can't do that either. But the exclusionary rule is aimed at deterring police conduct. And here we do not have some type of flagrant conduct where they interviewed or they tried to interview Mr. Mendez when he was stopped. All the record is undisputed that all he was asked was identifying information. There was no information asked about the gun or the meth, excuse me, not meth, but the synthetic marijuana found in the car or any of that. It was just identifying information. So I believe it was just... You say there's no flagrant. I mean, stopping the car was a problem, wasn't it? Yeah, but a bad stop doesn't equate flagrant conduct. I mean, the Supreme Court has said as much. We have to look at more. And so Agent Russell and Hernandez had both testified that there was no type of coercion and that the post-conduct, excuse me, the post-stop conduct was lawful. He wasn't questioned. Mendez was not questioned at all until they got to the DPS station in which he ultimately, or quickly rather, waived his Miranda rights. And they ask him essentially, you know, you're waiving him, and they go through the various steps and he says yes, and then they ask him again are you sure or something to that effect. Are you sure you understand? So there's nothing out at that scene of the stop or at the premises in which they're trying to exploit what ultimately is found to be a bad stop. And in that sense it is a lot like the Supreme Court's Utah case because we don't have Officer Thurman, the Corpus Christi stop officer, trying to extrapolate any type of information or anything like that. Mendez and his girlfriend are segregated. They're put in separate cars. They do the security sweep. All of that is above board. But as I said, Judge Rainey ultimately concludes because of Bailey, not because of the officer's conduct or anything like that, but because of Bailey that they were not in the immediate vicinity and therefore it was a bad stop. And Judge Rainey goes on. He mentions twice, I believe, in the order something about Miranda, something about maybe waiving, but he also specifically finds without a whole lot of detail admittedly, but he finds that his statements post-Miranda come into evidence. So we have a situation where the record is very well developed. Could they testify to more? Possibly. I don't know, but I don't think that they need to. And what we had at trial, I've read the trial transcript, as I'm sure Mr. Herman has too, and they did use that knowledge component. But this court also is in the position where it can look at that whole trial transcript as well in order to make this decision. And so really we're talking about a very narrow issue here, very narrow, because there's no dispute that he was a felon. But the government did use his confession that the bullets were his. Because, I mean, you don't need any of the guns, just the bullets found in the house. Okay, wait. I'm sorry. We have three different findings of bullets. The bullets that were lawfully obtained during the search warrant. Correct. And Mr. Herman agrees you had every right to go into that house and find those bullets. Correct. If you discharge that, which is the same crime as all the other stuff, he'd be convicted. But is it that you needed the confession where he says, yes, those are my bullets, because he might have said, well, there are bullets in my room, but, you know, someone put them there. I mean, the confession was used and was a key part of the case, right, to tie the knowledge. Judge Rainey asks that question more or less during the post-suppression hearing. Like, aren't we going to wind up in the same place anyway? You have the ammunition. You have a convicted felon. And the defense counsel starts to answer, and Judge Rainey interrupts him to say, he cuts off too, but I think it's along the line that he, you know, he defers to his judgment as a lawyer, that he's looking out for his client or something like that. The conversation dies. But, I mean, that confession was important for the government because it defeated any argument that the bullets were put there by someone else without his knowledge. Certainly. But we all know that many cases are proven simply on the circumstantial evidence. It's in your drawer. It's in your house. Those are tough cases. This made it a slam-dunk case. I'm not really sure why it went to trial even versus a stipulated bench trial. There's a suppression issue they wanted to preserve. But this took it from it. Those are arguable cases when it's just, oh, this is found under my car seat or in my desk drawer. Those are arguable cases. This confession turned it into a slam-dunk. They're found in his room. He said they were his. End of story. Yes. I mean, I, again, I. . . But you're not saying it was harmless, the admission of the confession. Well, you know, again, we're back to the suppression issue, and the court's entitled to look at it all. And basically what we have here is a hybrid situation, as Judge Rainey called it right from the get-go. And I think the fact that he is so conscientious and so cognizant of the law is exhibited in the fact that he granted part of the motion and denied the other part of the motion. I mean, clearly he thought very carefully about this. He evaluated the witness's credibility and all of those things. It wasn't as. . . And he didn't issue it alternatively either. It was, you have a bad stop, but this was enough. And he finds that the discovery of the ammunition in the house, because there's ammunition discovered in the car, and then there's ammunition discovered during the second house. I mean, excuse me, during the second search. But the ammunition discovered, pursuant to the search warrant, that that provided grounds to arrest Mr. Mendez, which is what happened. And that's . . . he was transported downtown, and not to, you know, repeat myself, but essentially that's where he waived his Miranda rights. So I believe that all of the necessary requirements under Utah and all of those cases have been met. And unless the Court has any additional questions, I'll yield the remainder of my time. Thank you. Mr. Herman? Your Honor, this case isn't just about dissatisfaction with the order. And it's not asking the Court to go through some sort of meaningless per se recitation of all the different factors, and nor are we attacking Judge Rainey as a conscientious judge. What this is about is a failure to analyze and to take evidence on all the factors that the Court's required to take. It was the government's burden to do that. The government has never pointed out anywhere in the record where the government actually said to Judge Rainey, here's our evidence on temporal proximity, here's our evidence on flagrancy. The government filed nothing in the district court to address those issues. And so Judge Rainey followed the government into that error. Could the defendant have pointed that out afterwards, after the memorandum order came out? Yes, the defendant could have. But the federal rules don't require the taking of exception to an order once it's been issued. And the defendant put the government to its burden, a burden at which it failed. And Judge Rainey simply looked to what the government put on. But that was insufficient. And so the issue here is a failure of the record. And this is very similar to Guzman. In that case, similarly, the Court looked to a factor there that the Court just got wrong. It had to do with trickery and getting the consent and getting a statement through trickery. But the Court said, we're only going, this Court said, we're only going to apply the all-reasonable view of the evidence rule and look at all the record and start to go fish and extract everything from it, when the district court has, one, asked all the right legal questions, and, two, actually weighed the evidence to answer those questions. And, yes, Judge Rainey mentioned the brown factors here, but there's nowhere in the record where Judge Rainey actually did what Guzman requires. He didn't actually weigh the evidence on temporal proximity, on flagrancy, on actual exploitation. Actual exploitation, moving on to another point, isn't something that's actually required. Brown set out the factors to get to an exploitation that's more of a psychological pressure. This Court recognized that similar type of psychological pressure in the case we cite, Hernandez, because it's important to remember that case had two different groups of people. The one defendant, Hernandez, where the Court found that her statement was definitely the result of the government's action, but then a group of witnesses. And the Court there recognized that once those witnesses knew that inculpating evidence had been found, that their initiative or motive not to give a statement had been compromised by their illegal detention and the illegal search that had occurred. So it's not just the actual exploitation in the sense of asking the person, and because of what I found, you need to tell me this. It's the psychological pressure that's recognized. That's why Brown v. Illinois, Taylor v. Alabama, Dunaway, they all involved illegal seizures of the defendant, not necessarily searches or confrontation with the results of that searches. And in terms of flagrancy, the Court seems to be, not the Court, I'm sorry, the government seems to be revisiting a lot of what the district court determined in terms of the violation of Bailey and seems to be sort of re-justifying that whole issue. But the district court made a determination, and the government did not appeal that determination. But I bring it out here because what I've argued is that the purposefulness came in the violation of Bailey. I'm not arguing that the government somehow overbore his will through torture or some other extraordinary act, but the flagrancy of the violation of Bailey is itself important. That was something that the Supreme Court had already said two years before. That was where the Court laid down some clear laws. In the Utah case, the Supreme Court had said 40 years before that to stop someone on the street at a Terry stop, you need reasonable suspicion. I mean, that's an even more fundamental thing that every cop knows, and that was violated. But the violation of the clear law, the Supreme Court says, isn't enough for flagrancy. There needs to be more. I mean, tell me if you read Utah differently. What the Court said there was that negligence, and that was what the issue was there, near negligence in terms of the officer's view of what the facts were that justified the belief in reasonable suspicion. But here this is more of a prophylactic rule from Bailey. The Court just said you don't stop the person after they've left the search premises when they're already away from the premises unless you have a reason to know that they're coming back, which they didn't have. And so these agents planned in advance to violate the strictures of Bailey. So that in itself is purposeful action taken by people who should know better, which goes beyond mere negligence because these are the law enforcement officers charged with exactly that set of duties. And finally, the importance here is to remand this case back to the district court. That's what this court did in Cherry. That's what this court did in Guzman where the district courts committed the same type of error, a failure to consider all of the factors. And that's important here because of what we've talked about. But also the government made reference to a 99-page transcript of that ultimate custodial statement. That's not in the record. The district court never determined what was in that custodial statement. I offered into the record before this court the four-minute segment that the government actually played at trial because the government actually played it. And so, in other words, it was in the record. It just wasn't transcribed properly. That's in the record now. But nobody's ever looked carefully at that 99-page transcript, and that's part of the evidence that the district court under Cherry and under Guzman needs to go back through. And we might very well wind up like this court decided in Cherry in 1986, which is that after remand, the district court found that the taint was attenuated, and this court subsequently agreed. We might very well be in that position. But the point now is that this court can't make that determination on the record that's before it. Thank you, Your Honor. Thank you, sir. This case will be submitted, and this panel will.